UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

LEOVIGILDO ESPINOZA,              CASE NO. 6:15-cv-1923-Orl-37GJK

     Plaintiff,

v.

BOBBY HARRELSON,

     Defendant.

_____/

JAVIER PEREZ,                  CASE NO. 6:15-cv-879-Orl-37GJK

     Plaintiff,

v.

BOBBY CRAIG HARRELSON, JR.;
CONSTANTINE PROCOS; and JOSHUA
SANTOS,

     Defendants.

_____/

## DECLARATION OF KENNETH R. WALLENTINE

1. My name is Kenneth R. Wallentine. I am over the age of majority, am competent to give this declaration, and have personal knowledge regarding the matters set forth herein. I submit this declaration pursuant to 28 U.S.C. § 1746.

2. I have been retained as an expert witness by counsel for Defendant Bobby Harrelson in each of the above-referenced lawsuits. I was retained to conduct a review of the January 22, 2012 event that gave rise to these lawsuits.

3. A copy of my expert report, which details my qualifications, is attached as Exhibit A to this declaration.

4. On December 15, 2016, I issued my expert report in connection with these lawsuits after I reviewed numerous documents relevant to these lawsuits.

5. The facts contained in this declaration regarding the subject incident are taken from the documents I reviewed regarding this lawsuit.

6. Based on my review of the incident that gave rise to these cases, I formed the opinion that the Deland Police Department officers' approach and contact tactics were reasonable and were consistent with generally accepted law enforcement policies, practices, and training.

7. The officers responding were told that the 911 caller reported men with a shotgun. A reasonable and well-trained police officer would have approached quietly, intending to gain the advantage of locating the subjects with a gun without the subjects knowing of the police response.

8. Virtually any call involving a subject or subjects believed to be armed would prompt a reasonable and well-trained officer to respond with a rifle and/or shotgun if available. Rifles (and shotguns with certain types of ammunition) are capable of greater precision, particularly at longer distance, and have other ballistic features that are superior to handguns.

9. The responding officers divided the initial response tasks—with Officer Grant Faustich going to meet with the complainant and the other officers moving quickly and quietly to the area where the subjects with the gun had been seen—consistent with common police response.

10. A reasonable and well-trained police officer would recognize that a boisterous response with police sirens blaring and car motors whining at high speeds would likely create additional problems and complications for the responding officers.

11. The officers knew they were responding to an area known for much criminal activity. This fact would prompt a reasonable and well-trained officer to respond with particular caution and stealth.

12. Once Javier Perez and Leovigildo Espinoza were detained and identified as the persons who aimed the rifle at Officer Bobby Harrelson and in the direction of the other officers, they were both arrested. A reasonable and well-trained officer would have believed that there was probable cause to arrest Perez and Espinoza for a violation of Florida law. A reasonable and well-trained officer would have then arrested Perez and Espinoza.

13. Based on my review of the incident that gave rise to these cases, I formed the opinion that Bobby Harrelson's use of force was consistent with generally accepted law enforcement policies, practices, and training.

14. As Officer Harrelson was looking into the yard, Espinoza spotted Officer Harrelson before Officer Harrelson called out. Espinoza then raised the rifle at Officer Harrelson, a uniformed police officer. This would be interpreted by any police officer as aggressive and threatening deadly force.

15. Officers Harrelson, Procos, and Santos described the rifle as having the "appearance of an SKS rifle." The SKS rifle is a large-bore, semi-automatic carbine chambered for the 7.62 x 39mm round. Millions of the original Soviet model and more than a dozen variant models have been manufactured in Eastern bloc nations in the past three-quarters of a century since the Soviet Army first began using the SKS rifle. It is one of the most widely circulated rifles in surplus use and can be cheaply and easily obtained in the United States. A standard SKS rifle has a typical rifle appearance, with a wooden stock and an internal box magazine. A photograph of an SKS rifle is included below:



16. SKS rifles are particularly dangerous and effective offensive weapons. The large 7.62 x 39mm round is easily capable of defeating the armor in a standard police ballistics vest. Police officers are generally aware of that round's destructive capacity, regardless of whether a particular officer may be familiar with the precise operation and ballistics qualities of that round.

17. The rifle wielded by Perez and Espinoza is easily mistaken for an SKS rifle when viewed at a distance. A photograph of the pellet gun is included below:



18. Pellet guns are readily capable of inflicting death or serious bodily injury. I have personally seen numerous animals killed with pellet rifles similar to that which Perez and Espinoza wielded in the course of the incident that gave rise to these lawsuits.

19. A reasonable and well-trained officer facing a subject aiming a rifle directly at the officer would respond to the threat with deadly force. Officer Harrelson reasonably believed that Espinoza was about to shoot him with a powerful rifle.

20. Officer Harrelson commendably delayed his response until Espinoza moved to a cheek weld—interpreted fairly as a signal that Espinoza intended to immediately fire the rifle. Moreover, Officer Harrelson gave verbal commands to drop the gun and raise his hands before he addressed the threat by firing his rifle.

21. Officer Harrelson initially fired two rounds at Espinoza as Espinoza was aiming the rifle at Officer Harrelson. Espinoza then crouched down behind a stove that was present in the yard. A reasonable and well-trained officer would recognize that Espinoza's actions were very consistent with those of an armed assailant. Officer Harrelson firing upon Espinoza as Espinoza raised the rifle at him was the action of a reasonable and well-trained police officer.

22. As Espinoza crouched down, as if to take cover, Perez then raised up. Officer Harrelson observed Perez grab the rifle from where Espinoza had laid it and Officer Harrelson saw Perez aim it directly toward Officer Harrelson. Officer Harrelson reasonably believed that Perez was about to shoot at him with the rifle. A reasonable and well-trained officer facing Perez as he was aiming a rifle directly at the officer would respond to the threat with deadly force. Officer Harrelson firing upon Perez as Perez raised the rifle at Officer Harrelson was the action of a reasonable and well-trained police officer.

23. Officers are taught to continue to fire at a threat until the threat ceases to be a threat—in other words, to fire until the person stops his or her threatening, aggressive action. A reasonable and well-trained officer would continue to fire upon Perez until he was no longer aiming a rifle toward the officer.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on this 1st day of March, 2017.

Kenneth R. Wallentine

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

---

|  | : |  |
| LEOVIGILDO ESPINOZA and | | |
| JAVIER PEREZ, | : | |
| Plaintiffs, | | |
|  | : | No. 6:15-CV-1923-ORL-37GJK |
| vs. | | |
|  | : | |
| BOBBY HARRELSON, JOSHUA SANTOS, | | |
| CONSTANTINE PROCOS, and | : | Report of Kenneth R. Wallentine |
| CITY OF DELAND, | | |
| Defendants. | : | |

---

The following report of Kenneth R. Wallentine is submitted after reviewing the following

documents, pleadings, records, and reports:

Plaintiffs' Amended Complaint

Deland Police Department excerpted reports

Investigator Joshua Mott report and diagrams

Florida Department of Law Enforcement investigation report

Court transcripts from criminal trial, State v. Espinoza

Deposition of Leovigildo Espinoza

Deposition of Javier Perez

Deposition of Officer Constantine Procos (given for criminal trial, State v. Espinoza)

Deposition of Officer Bobby Harrelson (given for criminal trial, State v. Espinoza)

Deposition of Officer Joshua Santos (given for criminal trial, State v. Espinoza)

Deposition of Officer Constantine Procos (given for civil action)

Deposition of Officer Bobby Harrelson (given for civil action)

Deposition of Officer Joshua Santos (given for civil action)

Deland Police Department excerpted policies

Employment file for Officer Bobby Harrelson

Internal Investigation file for Officer Bobby Harrelson

Kenneth R. Wallentine states as follows:

1.  In the instant matter, I have relied upon the documents, pleadings, records, reports, and statements previously described. I have formed a number of opinions based upon the aforementioned, as well as my experience, education, and familiarity with professional publications. I have relied on a variety of professional publications, including, but not limited to, my own publications and court decisions cited therein. I have considered various statements and accounts that may be in conflict one with another and considered factors such as the time at which the statement was made, the interests of the party making the statement, the vantage and view opportunities and perceptive abilities and consistency or inconsistency with the physical evidence, and evidence of chemical impairment or impaired cognition and the collective statements of other witnesses. My opinions, and a summary of the circumstances known or reported to me upon which those opinions are based, are set forth herein as follows.

**Abbreviated synopsis:**

Just after one p.m. on January 22, 2012, Deland Police Department Officers Bobby Harrelson, Joshua Santos and Constantine Procos were dispatched to a complaint of men shooting a gun in the backyard of 133B West Carroll Avenue in Deland, Florida. The officers were initially told that someone was shooting a shotgun. A woman who lived nearby, Connie Bond, had telephoned the police emergency dispatcher to report that she saw three Hispanic males pointing a gun in the direction of her home. She said that she was concerned for her safety and her daughter's safety. Bond lived just behind 133B West Carroll Avenue.

Officers Harrelson and Procos were teamed together; Officer Procos was under the field training tutelage of Officer Harrelson. Officer Santos arrived separately. Officer Grant Faustich arrived separately. Officer Faustich and Officer Santos spoke briefly with Connie Bond before moving toward the other officers. Officers Harrelson, Santos and Procos approached fence line near the location where Bond had seen the men with the gun.

As Officer Harrelson walked to the rear of Bond's home, he saw a tall wooden stockade-type fence and noticed a break in the fence. He went to the break in the fence to look through. Consistent with Bond's report, Officer Harrelson saw three Hispanic males in the yard on the other side of the fence. He saw Arndolfo Granados-Mendoza spraying water on a dog kennel. Javier Perez and Leovigildo Espinoza were in the vicinity of a raised landing or porch on the back of the residence. There was an old oven/stove range household appliance near them. The yard was littered with trash, beer cans and miscellaneous junk.

As Officer Harrelson looked through the break in the fence, Perez and Espinoza both looked directly toward him. Officer Harrelson saw Perez crouch down behind the stove. At the

same time, Espinoza picked up the rifle and aimed it at Officer Harrelson. From his vantage point behind the fence and slight distance to Officer Harrelson's left, Officer Procos could see Espinoza aim the rifle at Officer Harrelson. Officer Harrelson shouted commands, such as "police, show me your hands" several times. Espinoza moved his cheek to the stock of the rifle, a movement commonly referred to as a "cheek weld" and commonly understood to be an immediate precursor to firing a rifle. Officer Santos, a Spanish speaker, shouted commands in both Spanish and English, saying "hands up" (in English) and "manos arriba" (in Spanish), follow by "baja la pistola" (in Spanish) and "drop the gun" (in English).

When Espinoza started his cheek weld, Officer Harrelson fired his AR-15 rifle at Espinoza, shooting two rounds. Espinoza crouched down behind the stove. Perez then raised up slightly, then visible above the stove. Perez picked up the rifle and he aimed it toward Officer Harrelson. Officer Harrelson fired his rifle at Perez, again shooting two rounds. Perez ducked, then rose up again. Officer Harrelson could see Perez's head and shoulders and see that Perez was still holding the rifle. Officer Harrelson fired his rifle a third time, shooting two more rounds at Perez.

Perez stood up and put the rifle down on the stove and raised his hands in the air, as if to signal that he wanted to surrender. Espinoza crawled from behind the stove and then quickly moved out of Officer Harrelson's sight. Espinoza went around the side of the house. Officer Harrelson remained at the fence, watching for further movement.

Officer Santos called out commands in Spanish to Perez and Mendoza to get on the ground. Officers Faustich and Santos kicked fence slats out to allow them to pass through the fence. Other officers were in the front of the house by this time and they took Espinoza into

custody. Perez and Mendoza were handcuffed. The officers called for medical attention for Perez and Espinoza.

a.     **The Deland Police Department officers' approach and contact tactics were reasonable and were consistent with generally accepted law enforcement policies, practices and training.**

1.     The officers were told that the caller reported men with a shotgun. As far as the officers knew, there was no reason to believe that the subjects of the call were aware that the police had been called and that officers were responding. A reasonable and well-trained police officer would have approached quietly, intending to gain the advantage of locating the subjects with a gun without the subjects knowing of the police response. A reasonable police response should include enough officers, where possible, to provide superior numbers to contain the subjects and prevent flight. This is particularly important in a dense residential neighborhood.

2.     Virtually any call involving a subject or subjects believed to be armed would prompt a reasonable and well-trained officer to respond with a rifle and/or shotgun if available. Rifles (and shotguns with certain types of ammunition) are capable of greater precision, particularly at longer distances, and have other ballistic features that are superior to handguns.

3.     Though not all of the officers received the information, the emergency dispatcher gave some information indicating that a prior dispatcher or call taker might have

suspected the reporting person could have some degree of mental illness.[1]  Such

information could potentially alter the police response in some types of calls.

Mentally ill persons may possibly perceive or report danger differently than

others; nonetheless the officers must still carefully and thoroughly investigate a

complaint of a gun aimed in the direction of a house or person.  A reasonable and

well-trained officer would know that the report of a "man with a gun" requires an

urgent and tactically appropriate response no matter what a third party might

perceive or suspect about the mental state of a caller.  By its very nature, a "man

with a gun" situation is likely to prompt an emotional and perhaps even

distraught, incomplete and confused report, particularly in a residential

neighborhood.  Most folks are disturbed, frightened and even disoriented by the

sight of a person in a residential backyard holding a gun.

4.      The responding officers divided the initial response tasks, with Officer Faustich

going to meet with the complainant and the other officers moving quickly and

quietly to the area where the subjects with the gun had been seen.  This is

consistent with common police response.

5.      A reasonable and well-trained officer would recognize that a boisterous response

with police sirens blaring and car motors whining at high speeds would likely

create additional problems and complications for the responding officers.  Such a

response would certainly alert the subjects of the call.  The subjects could very

likely separate and flee, barricade themselves or set up an ambush for responding

---

[1] Other than the impression of a call-taker or dispatcher, there is no evidence that the complainant experienced some degree of mental illness.

officers. It might even provoke a harmful act by the subjects that could have been prevented by a more tactically sound response. A loud response would also likely prompt residents and persons in the neighborhood to congregate in the area of the emergency, potentially–almost certainly–impairing the police response.

6.       The officers knew that they were responding to an area known for much criminal activity. Officer Harrelson knew that is was a high crime area, with prior incidents of shots fired, numerous illegal drug deals, burglaries, robberies and prostitution. This fact would prompt a reasonable and well-trained officer to respond with particular caution and stealth.

7.       Once Perez and Espinoza were detained and had been identified as the persons who aimed the rifle at Officer Harrelson and in the direction of the other officers, they were both arrested. A reasonable and well-trained officer would have believed that there was probable cause to arrest Perez and Espinoza for a violation of Florida law. A reasonable and well-trained officer would have then arrested Perez and Espinoza.

b.       **Officer Harrelson's use of force was consistent with generally accepted law enforcement policies, practices and training.**

1.       As Officer Harrelson was looking into the yard toward Perez, Mendoz and Espinoza, Espinoza spotted him before Officer Harrelson called out. Espinoza's first action–raising the gun at a uniformed police officer–would be interpreted by any police officer as aggressive and threatening deadly force. The rifle plainly

looked like a potentially deadly high power rifle. It was aimed directly at Officer Harrelson.

2. Officers Harrelson, Santos and Procos each described the rifle as having "appearance of an SKS rifle." The SKS rifle is a large bore semi-automatic carbine chambered for the $7.62 \times 39$mm round. Literally millions and millions of the original Soviet model and more than a dozen variant models have been manufactured in Eastern bloc nations in the past three-quarters of a century since the Soviet Army first began using the SKS rifle. It is one of the most widely circulated rifles in surplus use and can be cheaply and easily obtained in the United States. A standard SKS rifle has a typical rifle appearance, with a wooden stock and an internal box magazine. Despite its flaws and its reputation as a "cheap" gun, it is a particularly dangerous and effective offensive weapon. The large $7.62 \times 39$mm round is easily capable of defeating the armor in a standard police ballistic vest. Police officers are generally aware of its destructive capacity, whether or not a particular officer may be familiar with the precise operation and ballistic qualities. I have examined the photograph of the rifle wielded by Perez and Espinoza and agree that it is easily mistaken as an SKS rifle when viewed at a distance.[2]

---

[2] The Cummins Industrial Tools Pellet Rifle has been compared in appearance to the SKS rifle in literature. The Cummins Industrial Tools Pellet Rifle is reputed to be one of the more powerful air rifles. Though all parties now understand that the rifle aimed at the officers was a pellet gun and not an actual SKS rifle or some other firearm, there is no doubt that pellet guns are readily capable of inflicting death or serious bodily injury. The pellet gun appears to me to be a pump action .22 caliber pellet rifle. I personally have seen numerous animals killed with a similar rifle. The famous line from *The Christmas Story*, "you'll shoot your eye out" is not only a common refrain from parents, but it borne out in air gun injury statistics. Human deaths

3.      A reasonable and well-trained officer facing a subject aiming a rifle directly at him would respond to the threat with deadly force. Officer Harrelson reasonably believed that Espinoza was about to shoot at him with a powerful rifle. Commendably, Officer Harrelson delayed his response until Espinoza moved to a cheek weld–interpreted fairly as a signal that Espinoza intended to immediately fire the rifle. Moreover, Officer Harrelson also gave verbal commands before he addressed the threat by firing his rifle. At the same time, Officer Santos shouted to Espinoza in both Spanish and English, telling him to drop the gun and raise his hands.

4.      Officer Harrelson initially fired two rounds at Espinoza as Espinoza was aiming. Then Espinoza crouched down behind the stove. A reasonable and well-trained officer would recognize that Espinoza's actions were very consistent with those of an armed assailant. Firing upon Espinoza as Espinoza raised the rifle at him was the action of a reasonable and well-trained police officer.

5.      After Espinoza crouched down, as if to take cover, Perez then raised up. Officer Harrelson saw Perez grab the rifle from where Espinoza had laid it and he saw Perez aim it directly toward him. Officer Harrelson reasonably believed that Perez was about to shoot at him with the rifle. A reasonable and well-trained officer facing Perez as he was aiming a rifle directly at him would respond to the threat with deadly force. Officer Harrelson fired his rifle at Perez, again shooting two rounds. Firing upon Perez as he raised the rifle at Officer Harrelson was the

caused by pellet guns are certainly less common than deaths from firearms.

action of a reasonable and well-trained police officer. Perez moved down out of view and quickly raised himself up, still holding the rifle toward Officer Harrelson. Officer Harrelson fired his rifle twice again. Officers are taught to continue to fire at a threat until the threat ceases to be a threat–in other words, to fire until the person stops his threatening aggressive action. A reasonable and well-trained officer would continue to fire up Perez until he was no longer aiming a rifle toward him.

6. Plaintiffs have offered accounts of events that are partially inconsistent with the officers' statements and the Florida Department of Law Enforcement's investigative conclusions. For example, some time after the events, Espinoza claimed that he and Perez had not fired the pellet rifle since approximately one hour prior to the arrival of the police. When interviewed shortly after the incident by Florida Department of Law Enforcement Special Agent Kathi Kennedy, Perez could not remember who was holding the rifle at the time that the police arrived, but seemed to suggest that one of the men in the yard was holding it. He then explained that after he and Espinoza took turns shooting the rifle, each one would lay the rifle on the stove. Mendoza reported seeing Perez with the rifle, but not Espinoza. When Special Agent Kennedy asked Espinoza whether Perez was holding the rifle when the officers arrived, Espinoza told her, "the truth is I don't remember, and don't think so." It is very probable that Espinoza's and Perez's memory and perception ability were significantly impaired at the time of the incident. They had been consuming alcohol throughout the day, beginning early

in the morning. Though it is not certain just how drunk they were, they had consumed a lot of beer. At trial, Espinoza testified that in the five hours before the incident he could not remember how cans of beer he drank, but he said that he drank "lots of them." At his deposition, he said that he drank more than 12 beers, and more likely had as many as 18 cans of beer. Perez testified that he had somewhere around 12 cans of beer prior to the shooting. Their friend, Mendoza, confirmed that they had all been drinking beer throughout the day. Espinoza told Special Agent Kennedy that prior to the shooting, he heard the officers yell something, though he could not remember what the officers said. I have carefully considered plaintiffs' statements and the conflicting evidence in formulating my opinions.

7.     After he aimed it at Officer Harrelson and was shot, Perez stood up and put the rifle down on the stove. Officer Santos, acting at a supervisor's direction, moved the rifle from off the top of the stove in an effort to secure the rifle. He also took custody of a knife. Thus, the rifle was not photographed *in situ*. The rifle may not have been put back in the same position. There is no dispute that both Espinoza and Perez manipulated and fired the rifle at some point on January 22, 2013. Plaintiffs' statements and palm print evidence confirm this. I have considered the fact that the rifle was moved after the shooting and prior to collection as evidence and I conclude that it has no bearing on my opinions stated herein.

2.     In reaching my opinions in this matter I have relied upon my training and experience in public safety acquired throughout my career.  A summary of my qualifications, publications, litigation history and fee schedule are recited herein.

3.     **My qualifications as an expert in this subject matter include the following:**  I am a law enforcement officer in the State of Utah.  I became certified as a law enforcement officer in the State of Utah in 1982.  Until April 1, 2014, I was employed with the Utah Attorney General, where I served as the Chief of Law Enforcement.  I am currently employed as a Special Agent with the Utah Attorney General Investigation Division, where I coordinate a statewide use of force training initiative and coordinate officer-involved shooting investigations and other special investigations.  I also serve in a consultation role as Senior Legal Advisor for Lexipol, the nation's leading provider of law enforcement risk management resources.

I was formerly employed as a Bureau Chief at the Utah Department of Public Safety, Peace Officer Standards and Training Division, where I supervised investigations into allegations of improper and excessive force, officer integrity, and criminal acts alleged to have been committed by law enforcement officers and supervised in-service training administration and certification for all peace officers in the State of Utah.  I also supervised the police service dog training and certification program for the State of Utah.  I had responsibility for policy drafting and review for the parent agency, the Utah Department of Public Safety.

My duties included direct supervision and command of various investigative units and agents throughout the State of Utah, supervising law enforcement officers, forensic specialists, and technicians.  I commanded the State of Utah Child Abduction Response Team.  I commanded the State of Utah Officer-Involved Fatality Investigation Team.  I am a member of

the Board of Review of the Utah Technical Assistance Program, consulting in cold case homicide and complex violent person crimes investigations. In 2010, Governor Herbert selected me for the Governor's Leadership in Public Service award for my work in public safety leadership.

4.        I was formerly responsible for providing delivery of the Basic Training Curriculum related to all legal subjects, as well as certain tactical subjects, at the Utah Law Enforcement Academy. I continue to teach at the Utah Law Enforcement Academy. I am the author of the police academy curriculum currently in use for several subjects, including, but not limited to, use of force, reasonable force, use of force and police service dog teams, search and seizure, search and seizure for police service dog teams, and use of force/firearms instructor liability. I regularly teach in the Basic Training programs of the Utah State Police Academy. I regularly teach in the following specialized courses: Advanced Officer Course, Firearms Instructor Course, Utah Drug Academy, Utah Crime Scene Investigators Academy, Utah Sheriffs' Association Command College, First Line Supervisor Course, POST K9 Unit Administrator Course, POST Patrol Dog Handler Course, POST Narcotics Detector Dog Course, and others. I am a former police service dog handler and worked with the Uintah County Sheriff's K9 Unit from 1995 to 2001. I continue to provide instruction and evaluation services for the POST Police Service Dog program. I am a certified POST Firearms Instructor, often serving as the lead instructor for POST Firearms courses. I am certified by the Force Science Research Center as a Force Science Analyst®. I am a former certified TASER® Instructor. I am a certified Excited Delirium and Sudden Death Investigation Instructor. I was certified by the Los Angeles Police Department in Officer-Involved Shooting Investigation. In 2011, I was certified by the Institute for the Prevention of Sudden In-Custody Death as an instructor in restraint systems.

5.      I am a licensed attorney, having practiced law since 1990.  I am admitted to practice

before the United States Supreme Court, the Courts of Appeals for the Fifth and Tenth Circuits,

and the State and Federal courts in the State of Utah.  I am a Master of the Bench of the

American Inns of Court, Inn One, where I also serve as the past-President of the Inn of Court.  I

serve as an Administrative Law Judge for the State of Utah and for various counties and cities in

Utah, providing hearing officer and appellate hearing services for hearings involving allegations

of police officer misconduct for a variety of state agencies and municipalities.  I was formerly on

the faculty of Excelsior College, teaching Criminal Procedure, Evidence and Management

Strategies for Public Safety.

6.      In addition to my primary employment, I occasionally consult and provide expert witness

opinions on police procedures, and use of force issues.  I occasionally perform in-custody death

investigations and officer-involved shooting death investigations for agencies which may lack the

requisite expertise.  I am a consultant to the Utah Risk Management Mutual Association, the

state's largest insurer of public safety agencies, on matters of officer conduct and discipline,

hiring and screening practices, use of force, and police pursuit policies.  I am the co-founder of a

best practices advisory group that developed comprehensive model policies and best practices

under the authority of the Utah Chiefs of Police Association, the Utah Sheriffs' Association and

various state law enforcement agencies.  These policies serve as a model for all Utah public

safety agencies.  I am the author of a number of model policies for law enforcement agencies,

and have provided policy drafting and policy review services for several agencies, including

policy drafting responsibility for large law enforcement agencies.  I have served as a contract

consultant to the United States Department of Justice, assigned to provide technical assistance and management consulting to various public safety entities in the United States.

7.      I participate and serve in a number of community and professional capacities. Professional activities pertinent to law enforcement include serving as a Past-President of the Utah Peace Officers Association, former Board Member of the Utah SWAT Association, member of the International Association of Law Enforcement Educators and Trainers Association, member of the International Association of Chiefs of Police and the Utah Chiefs of Police Association, member of the National Tactical Officers Association, member of the International Association of Law Enforcement Firearms Instructors, member of the International Association of Directors of Law Enforcement Standards and Training, member of the International Law Enforcement Educators and Trainers Association, member of the K9 Section of the Utah Peace Officers Association, member of the United States Police Canine Association, past member of the board of directors of the NAACP, Salt Lake City branch, and board member and immediate past-Chairman of the Utah Law Enforcement Legislative Committee. I formerly served as a gubernatorial appointee to the Council on Peace Officer Standards and Training. I am a former member of the Scientific Working Group on Dog and Orthogonal Detector Guidelines, a national scientific best practices organization sponsored by the Federal Bureau of Investigation, the Department of Homeland Security, and the Transportation Security Administration, with support coordinated by the International Forensic Research Institute at Florida International University. I have been a presenter at a variety of professional conferences and seminars, including presenting on use of force training at the annual convention of the

International Association of Chiefs of Police and the International Conference of the Institute for the Prevention of Sudden In-Custody Death.

8.      Since 1994, I have been a consultant with the K9 Academy for Law Enforcement and the International Police Canine Conference.  My principal responsibilities are to provide use of force training, civil liability instruction, and search and seizure instruction.  I have provided police service dog training and certification standards consultation for two police service dog organizations, including a western regional group and one of the major national groups.  I serve as a consultant for the California Narcotic and Explosive Canine Association and have been a featured lecturer at their annual training conference over the past decade.

9.      I the Senior Legal Advisor for Lexipol, Inc., the nation's largest provider of policy formulation and revision for public safety agencies and policy-based training, responsible for reviewing and editing the work of legal staff in creation of policy manuals for law enforcement agencies.  In that capacity, I have assisted in the drafting and review of use of force and other policies in current use by more than 2,000 police agencies and correctional facilities in the United States.

10.      **My publications (limited to ten years) include the following:**  I have previously published a number of other professional articles, many of which have been subjected to peer review.  My most recent book, *The K9 Officer's Legal Handbook*, 2nd ed., was published by Lexis/Nexis Matthew Bender in February 2014, with a 2015 Supplement published in February 2015, and a 2016 Supplement now in publication.  It includes an extensive discussion of use of force by police officers.  Another book, *Street Legal: A Guide to Pre-trial Criminal Procedure for Police, Prosecutors, and Defenders*, was published in 2007 by the American Bar Association

Publishing Division. It is a treatise on public safety and criminal procedure, and includes

multiple chapters on search and seizure and use of force by police officers. My other published

works, limited to the past ten years, include: *Armstrong v. Village of Pinehurst: Training and*

*Policy Implications for Police*, Police Chief, V. 83, No. 6 (2016); *Supreme Court Decision Casts*

*Doubt on Hotel Registry Ordinances*, Police Chief, V. 81, No. 10 (2015); *Body Worn Cameras:*

*Plan Before Your Office Buys In*, The Sheriff (June 2015); *Legal Risks of Failing to Care for*

*Children of Arrested Persons*, Police Chief, V. 81, No. 10 (2014); *A Rational Foundation for*

*Use of Force Policy, Training and Assessment*, 2014 (2) AELE Mo. L. J. 101; *Post Incident*

*Video Review*, Police Chief, V. 68, No. 12 (2011); *Cell Site Location Evidence: A New Frontier*

*in Cyber-Investigation*, 2011 (2) AELE Mo. L. J. 501, *Prospects, Pitfalls and Pains of Social*

*Media and Public Safety*, The Municipal Lawyer, September 2010; *Police Department May Read*

*Text Messages Sent on Agency-issued Pagers: City of Ontario, California v. Quon*, Police Chief,

V. 57, No. 8 (2010); *Collection of DNA Upon Arrest: Expanding Investigative Frontiers*, Police

Chief, V. 57, No. 1 (2010); *Targeting TASER: The New TASER Aim Points,* Law Officer,

January 2010; *The Risky Continuum: Abandoning the Use of Force Continuum to Enhance Risk*

*Management*, The Municipal Lawyer, July 2009; *Explosive Detector Dog Legal Issues*, K9 Cop,

February 2009; *Does Police Service Dog Deployment Equal Deadly Force?*, K9 Cop, April

2009; *Human Scent Line-up Evidence*, Police K9 Magazine, August 2009; *Acknowledging*

*Gender in Fitness Standards for Police: An Invitation to Liability?*, The Municipal Lawyer,

January 2008; *K9 Court Testimony*, Police K9, December 2006; *United States Supreme Court*

*Review for Corrections Managers*, Corrections Managers Report, October 2006. I am the author

of a reference book currently in use in the Utah Law Enforcement Academy, as well as other

police academies throughout the United States, titled *Criminal Procedure: The Street Cop's Guide* (Aspen Press 2005). This book discusses detention and arrest of persons, use of force, and search and seizure of persons and property, among other subjects.

11. **My fee schedule is established as follows:** I charge $250.00 per hour for examination of reports and documents, site visits, interviews, administrative tribunal, deposition or court testimony, with a minimum of $1,000.00 for deposition or court testimony. I bill for actual travel expenses and a travel fee of $1,000.00 per day/part-day for travel to western states and $1,500.00 per day/part-day outside western states.

12. **My prior experience as an expert witness (limited to the past four years) includes the following cases:** I have been qualified as an expert in the subject matter of police procedures, including use of TASER® devices, excessive force, shootings and wrongful death claims, search and seizure, police service dog use, both in drug detection and dog bites, and I have never had a court decline to find that I am a qualified expert witness. I have testified and/or provided depositions and trial testimony in the following cases which may be generally related to the subject of the instant litigation in the past four years: *Christiansen v. West Valley City, et al.*, No. 2:14-cv-00025, United States District Court for the District of Utah, 2016. Trial testimony given on behalf of defendants. Subject matter: excessive force. *State v. Barney*, No. 161300117, Fourth District Court, State of Utah, 2016. Trial testimony given on behalf of the prosecution. Subject matter: use of force. *Mims v. City of Charlotte*, No. 2014-CVS-23815, Superior Court of North Carolina, 2016. Deposition testimony given on behalf of the defendants. Subject matter: wrongful death. *United States v. Jereb*, No. 2:15-mj-00356, United States District Court for Utah, 2016. Trial testimony given on behalf of the prosecution. Subject matter: use of an

electronic control device. *Talley v. City of Charlotte*, No. No. 3:14 CV 683, United States District Court for the Western District of North Carolina, 2016. Deposition testimony given on behalf of the defendants. Subject matter: negligent custody. *Gonzales v. Douglas*, No. CV-15-00064-PHX-NVW, United States District Court for the District of Arizona, 2016. Deposition testimony given on behalf of defendant. Subject matter: excessive force. *McDonald v. Dupnik*, No. C20142895 Superior Court, State of Arizona, Pima County, 2016. Trial and deposition testimony given on behalf of defendants. Subject matter: excessive force. *McKenney v. Mangino*, No. 2:15-CV-73-JDL, United States District Court for the District of Maine, 2015. Deposition testimony given on behalf of defendant. Subject matter: wrongful death. *Moore v. City of Lakeland*, No. 8:13-cv-02660-T-26TBM, United States District Court for the Middle District of Florida, 2015. Trial testimony given on behalf of defendant. Subject matter: excessive force. *Frasier v. McCallum, et al.*, No. 1:14-cv-00009-MP-GRJ, United States District Court for the Northern District of Florida, 2015. Deposition testimony given on behalf of defendant. Subject matter: mistaken arrest. *Wolffis v. City of Gainesville*, No. 1:14-cv-130, United States District Court for the Northern District of Florida, 2015. Deposition testimony given on behalf of defendant. Subject matter: excessive force. *Castillo v. City of Tempe*, No. 2:12-CV-02225-ROS, United States District Court for the District of Arizona, 2015. Trial testimony given on behalf of defendants. Subject matter: excessive force. *Stoedter v. Salt Lake County, et al.*, No. 2:12-CV-255-BJ, United States District Court for the District of Utah, 2015. Trial and deposition testimony given on behalf of the defendants. Subject matter: police force to effect arrest. *Williams v. TASER, Internat'l and the City of Charlotte*, No. 3:12-CV-838, United States District Court for the Western District of North Carolina, 2014. Trial and deposition

testimony given on behalf of the defendants. Subject matter: wrongful death. *Ali v. City of Tempe*, No. CV2013-091264, Superior Court, State of Arizona, Maricopa County, 2014. Deposition testimony given on behalf of defendants. Subject matter: excessive force. *Texiera v. United States of America, et al.*, No. 2:11-CV-02022, United States District Court for the District of Nevada, 2014. Trial and deposition testimony given on behalf of the defendants. Subject matter: police canines. *Clark v. Box Elder County et al.*, No. 1:13-cv-00079-CW, United States District Court for the District of Utah, 2014. Deposition testimony given on behalf of the defendants. Subject matter: wrongful death. *Chief v. West Valley City Police, et al.*, No. 2:11-CV-643, United States District Court for the District of Utah, 2013. Deposition testimony given on behalf of the defendants. *Campbell & Gemperline v. City of Springboro et al.*, No. 1:08-cv-00737, United States District Court for the Southern District of Ohio, 2013. Deposition testimony given on behalf of the defendants. Subject matter: police canines. *Thompson v. City of Lebanon*, No. 1:10-CV-0035, United States District Court for the Middle District of Tennessee, 2013. Deposition testimony given on behalf of the defendants. Subject matter: wrongful death. *Stoedter v. Salt Lake County, et al.*, No. 2:12-CV-255-BJ, United States District Court for the District of Utah, 2013. Deposition testimony given on behalf of the defendants. *Boggs v. City of Waterloo*, No. LACV116584-CW, Blackhawk County District Court, 2013. Deposition testimony given on behalf of defendants. *Schmidtke v. Marion County Sheriff et al.*, No. 5:10-CV-293-OC- 10prl, United States District Court for the Middle District of Florida, 2012. Deposition testimony given on behalf of the defendants. *Alusa v. Salt Lake County Sheriff, et al.*, No. 2:11-CV-00184-CW, United States District Court for the District of Utah, 2012. Deposition testimony given on behalf of the defendants. *Woodward v. City of*

*Gallatin, et al.*, No. 3:10-CV-01060, United States District Court for the Middle District of Tennessee, 2012. Deposition testimony given on behalf of the defendants. *Minor v. Johnson, et al.*, No. 1016-CV08762, Circuit Court of Jackson County, Missouri, 2012. Deposition testimony given on behalf of defendants. *Garcia v. Sacramento City, et al.,* No. 2:10-CV-00826-JAM-KJN, United States District Court of California, Eastern Division, 2012. Deposition testimony given on behalf of the defendants.

The observations and opinions stated herein are preliminary, insofar as additional information may be provided to me through the course of discovery and other incidents of the litigation process. They are based on the best information presently known to me. I have assumed the general accuracy of the documents, statements, and reports, excepting those expressed as opinions and those conflicting one with another and/or conflicting with physical evidence, that were provided to me. The opinions herein may be supplemented and/or revised upon receipt of additional information, including, but not limited to, further deposition testimony, consideration of any report submitted by plaintiff's experts, further investigation and/or further witness interviews. I may supplement this report upon completion of depositions of witnesses in this matter and/or upon being provided with other investigative documents, and/or diagrams, video and photographs.

My trial testimony may be supported by exhibits that include the pleadings, documents, statements, depositions, diagrams, photographs, and reports listed herein, as well as illustrative evidence such as a visual presentation of computer-generated slides and visual images projected onto a screen, charts, graphs, or illustrations created to better illustrate the aforementioned documents.

CONCLUSION

The Deland Police Department officers' approach and contact tactics were reasonable and were consistent with generally accepted law enforcement policies, practices and training. Connie Bond reported that there were men with a shotgun. In essence, the officers were responding to a "man with a gun call," one of the highest priority calls for service due to the possible threat to public safety. The officers properly approached quietly, so that they could try to locate the men with a gun without them knowing of the police response.

Officer Harrelson's use of force was consistent with generally accepted law enforcement policies, practices and training. As Officer Harrelson toward Perez, Mendoz and Espinoza, Espinoza saw him and raised a rifle aimed at Officer Harrelson. Officer Harrelson, just like any police officer, understood this to be an aggressive and threatening action. He reasonably believed that he was about to shot with a powerful rifle. Firing upon Espinoza as Espinoza raised the rifle at him was a proper police response. Firing at Perez as he raised up, took the rifle in hand and aimed it, was also a proper police response.

Kenneth R. Wallentine
December 15, 2016